ACADEMY OF CHARTER SCHOOLS, a charter school; Academy of Charter Schools Association, a voluntary association; Wanda Barnes; John Kircher; Mindie Knowles; Eric Sanderson; Brenda Soucie; Philip Winkler and Evalee Winkler, Petitioners,

v.

ADAMS COUNTY SCHOOL DISTRICT NO. 12; Board of Education, Adams County School District No. 12, Respondents.

No. 99SC548.

Supreme Court of Colorado,
En Banc.

Sept. 17, 2001.

Rehearing Denied Oct. 15, 2001.

**458**

Law Office of Shawn D. Mitchell, Shawn D. Mitchell, Broomfield, CO, Attorney for Petitioners.

Semple, Miller & Mooney, P.C., Patrick B. Mooney, Kathleen M. Shannon, Julie C. Tolleson, Denver, CO, Attorneys for Respondents.

Justice MARTINEZ delivered the Opinion of the Court.

In this case, we consider whether a charter school may seek enforcement of the charter contract with its local school district. Plaintiffs-petitioners, Academy of Charter Schools (Academy), Academy of Charter Schools Association, and seven named individuals, seek to enforce a charter contract with Adams County School District No. 12 (the District) in court instead of through the dispute resolution process in the contract. Academy also seeks reversal of the court of appeals' determination that the private association of individuals here lacks standing to enforce the charter contract, regardless of the charter school's authority to sue the District.

In its complaint, Academy alleged that the District breached the charter contract in several ways, including withholding of promised support, retaining state and federal funds belonging to Academy by law, and violating Academy's statutory and contractual authority by interfering with Academy operations, including budgeting, hiring, and contracting. Academy initially sought enforcement of the contract from the State Board of Education (the State Board), which declined to exercise jurisdiction, concluding that Academy's remedy lay in enforcing the contract in district court. The district court dismissed Academy's complaint pursuant to the District's C.R.C.P. 12(b)(5) motion to dismiss, concluding that charter schools lack the authority to enforce their charter contracts. The district court further held that the Charter Schools Act (the Act) does not give charter schools authority to sue because charter schools are subordinate to their districts.

On appeal, the court of appeals affirmed the district court decision, but limited the rationale. The court of appeals held that, despite the implied authority given to charter schools to enforce their contracts in the Act, the fact that charter schools are subordinate to their school districts prevents them from bringing suit. The court concluded that, without an explicit expression of legislative intent to the contrary, subordinate agencies cannot sue their superior bodies. *Acad. of Charter Schs. v. Adams County Sch. Dist. No. 12*, 994 P.2d 442, 444 (Colo.App.1999). The court of appeals further held that the Act not only failed to express explicit authority to sue, but also that the Act withheld implied authority because a charter school is part of the school district that grants its charter.[1] *Id.*

---

1. The two issues on which we granted certiorari are as follows:

   (1) In litigation by a charter school to enforce an alleged contract with its host school district, whether the court of appeals erred by holding that (a) the charter school is part of and subordinate to the district, and (b) the Charter Schools Act does not authorize the charter school to sue the district, and, therefore, (c) the trial court properly dismissed the charter school's contract-based claims pursuant to C.R.C.P. 12(b)(5).

In 1999, the General Assembly amended section 22–30.5–104(7)(b), describing the power of charter schools to enter into various types of service contracts with their local school district or other third parties. Ch. 302, sec. 5, § 22–30.5–104(7)(b), 1999 Colo. Sess. Laws 1255, 1256. In that amended section, the legislature also expressly granted standing to charter schools to sue for enforcement of contracts formed under that paragraph (b). § 22–30.5–104(7)(b), 7 C.R.S. (2000). Finally, in House Bill 99–1274 (HB1274 or the Amendment), section 1 states that the legislative declaration behind the bill was to clarify the General Assembly's intent concerning the empowerment of charter schools to enter into contracts. Ch. 302, sec. 1, 1999 Colo. Sess. Laws 1255. The General Assembly also enacted section 22–30.5–107.5, 7 C.R.S. (2000). Ch. 302, sec. 3, § 22–30.5–107.5, 1999 Colo. Sess. Laws 1255, 1255–56. That section outlines the dispute resolution process to resolve disputes that may arise concerning the implementation of the charter contracts. § 22–30.5–107.5.

In light of theses 1999 amendments to the Act, we disagree with the decision of the court of appeals. We hold that the express grant of standing to charter schools to sue for enforcement of service contracts entered into in order to carry out the educational program described in the charter clarifies the power originally granted to charter schools in the Act. Because the charter contract between Academy and the District encompasses many contractual provisions related to the types of service contracts considered in section 22–30.5–104(7)(b), we hold that Academy has standing to bring those claims related to the service provisions of the contract against the District in the judicial system.

■ However, we further conclude that the dispute resolution process outlined in section 20–30.5–107.5 serves as a retroactive change of the process to resolve disputes concerning the governing policy provisions of the charter contract. Thus, we hold that the disputes between Academy and the District arising out of implementation of the statutorily required portions of the charter contract are not justiciable and are reserved for resolution by the State Board. Accordingly, we reverse the decision of the court of appeals, in part, and affirm it, in part.

I.

In 1993, following the enactment of the Charter Schools Act (the Act), sections 22–30.5–101 to 209, 7 C.R.S. (2000), a group of parents in Adams County developed a plan to open a charter school. The group formed an unincorporated voluntary association, named the Academy of Charter Schools.[2] The Association submitted an application for the Academy of Charter Schools to the Adams County School District No. 12. After negotiations, the District voted to approve Academy's application, but with significant alterations. Academy, considering these changes to be a rejection and counteroffer by the District, appealed to the State Board. The State Board ruled that the District had indeed denied Academy's application, and that such

(2) Whether, regardless of the authority of a public charter school, a private association of citizens that contracts with a school district to establish a charter school may enforce the contract for the benefit of the school.

2. The record in this case is unclear as to the distinctions between the several entities utilizing the name Academy of Charter Schools. According to the amended complaint filed in the district court, a group of Adams County parents joined together in a voluntary, unincorporated association, called Academy of Charter Schools. The complaint then alleges that the Academy of Charter Schools Association is a non-profit Colorado corporation. Furthermore, the caption in this case lists Academy of Charter Schools Association as a voluntary association. It is unclear in the complaint, as well as in other documents in the record, whether these bodies are distinct from one another, or are the same entity. Furthermore, the complaint also states that the charter contract, signed by a number of the individual plaintiffs here, purportedly created the Academy of Charter Schools. The actual charter contract, as well as other documents in the record are often unclear as to which Academy of Charter Schools is implicated, the association or the charter school. Because it is unclear whether the two associations are distinct entities, and because the trial court, the court of appeals, and apparently all of the parties, treat them as one body, we also treat them as one entity. Thus, for the balance of this opinion, the Association refers to both the unincorporated voluntary association, as well as the non-profit corporation.

denial was contrary to the best interests of the District, the community, and the students. The State Board remanded the issue to the District and Academy, instructing the two parties to resolve their dispute in a manner consistent with the State Board's decision.

In September 1994, the District and Academy entered into a charter contract which authorized the establishment of a charter school. Shortly thereafter, the District served Academy with notice of intent to withdraw the charter. After the District withdrew Academy's charter, Academy again appealed to the State Board, which ruled that revocation of the charter was, once again, contrary to the best interests of the District, the community, and the students.

Academy continues to function as a charter school, but brings this case because of alleged non-compliance by the District. Per the requirements in the contract, for the first year of the charter's existence, the District is required to provide Academy students with funding and services approximately equal to the resources given to other students in the District. This means that the District would give one-hundred percent of the per pupil operating revenues (PPOR) on a per capita basis, plus in-kind services, to help cover start-up costs for the first year. In years two and three, the District would continue to provide resources, although at a lower level than the first year of operation. Those resources consist of funding equal to eighty percent of the District's PPOR on a per capita basis. Additionally, in years two and three of the school's existence, the contract states that the District is to provide in-kind services making up for the other twenty percent of the PPOR.

In its complaint, Academy states numerous claims alleging that the District has not fulfilled its contractual obligations. For example, Academy alleges that after the first year, the District has refused to provide the services agreed upon, and has instead provided only employee payroll and accounting processing services, and has asserted that some portion of the District's overhead counts against the twenty percent. Academy additionally alleges that the District, in dero-

gation of its statutory duty, refused to distribute to Academy state and federal funds generated by disabled Academy students, or the staff serving them, under section 22–30.5–112(3)(a), 7 C.R.S. (2000).

Academy further claims that, under the charter contract and the Act, Academy has the authority to direct its affairs, including responsibility for its budget, operations, and for contracting with third parties. Academy alleges that the District refuses to allow Academy to possess or control its own funds, and instead the District maintains control over Academy's funds, requiring Academy to request payment for expenditures. By retaining this fiscal power, Academy alleges that the District illegally retains an effective line-item veto power over Academy operations, and that the District receives interest payments generated by Academy funds at Academy's expense. This behavior, Academy claims, is consistent with the District's policy of imposing new requirements upon Academy without amending the contract.

In response to all of these violations, Academy filed its complaint against the District. The District filed a motion to dismiss, or alternatively a motion for summary judgment. After Academy filed an amended complaint and the District filed a new motion to dismiss or for summary judgment, the district court granted the District's motion. The district court held that a charter school has no standing or statutory authority to sue its authorizing board of education, that the private association here had no standing to bring suit under the charter contract, that the dispute resolution provision of the charter contract barred actions arising from the charter, that Academy had no right to seek declaratory relief, and that Academy failed to state cognizable equal protection claims.

On appeal, the court of appeals held that Academy does not have standing to sue the school board over implementation of the charter, and that the Academy of Charter Schools Association was not a third-party beneficiary of the charter contract. *Academy*, 994 P.2d at 445–46. The court of appeals did, however, remand the individual plaintiffs' equal protection claims, finding that the amended complaint adequately stat-

ed those claims.[3] *Id.* at 447. Academy now appeals the court of appeals' decision.

## II.

Before we begin our analysis in this case, we first discuss the current version of the Act, as amended in 1999, with particular attention to the powers granted to charter schools with respect to different types of claims. Throughout the application, approval, and inauguration of a charter school, various duties are assigned, either contractually or statutorily, to different parties. The Act outlines the varied needs of a newly chartered school and provides processes through which a school may seek to fulfill those needs. Some needs, such as facilities maintenance and operation, may be fulfilled through contractual arrangements made pursuant to section 22–30.5–104. Other needs, such as governing policies, are necessarily fulfilled by the local school district, pursuant to the statutory requirements in sections 22–30.5–105 and –106. It is important to distinguish those needs and the means utilized to fulfill them in order to grasp the import of the statutory sections at issue before us.

### A. Service Contracts and the Right to Sue

■ Under section 22–30.5–104(7)(b), 7 C.R.S. (2000), charter schools have the authority to enter into and enforce contracts with their school districts, the governing board of a state college or university, or any other third party for the use of a building and grounds, and for services that enable the charter school to carry out the educational program described in its charter.[4] *Id.* Charter schools are free to choose whomever they prefer for provision of these services, and if the school contracts with its district, the services are to be provided by the district at cost. § 22–30.5–104(7)(b). If a charter school believes that the school district, or any other party with whom it has contracted, is not fulfilling its service obligations, the school

has the right to sue for enforcement of the facilities operation and maintenance contract against the other party. *Id.* Likewise, any party who has entered into a service contract with a charter school under the auspices of this paragraph (b) may bring an enforcement action against the charter school.

The services for which a charter school may contract in the facilities maintenance and operation provisions of the charter contract are entirely separate from the governing policy provisions in the charter contract which are statutorily required. *Compare* § 22–30.5–104(7)(b) *with* § 22–30.5–105 *and* § 22–30.5–106. Any disputes arising from the service agreements made under this section differ greatly from those arising out of implementation of the governing policy provisions. For example, if a charter school claims that the local school district has failed to provide specific services for which both parties contracted, the process for resolution does not involve the State Board, but instead looks to the judicial system. § 22–30.5–104(7)(b).

Unlike the governing policy provisions in a charter contract entered into according to sections 22–30.5–105 and –106, facilities operation and maintenance provisions entered into pursuant to paragraph (b) are judicially enforceable. Approval for such service contract provisions is not needed from the State Board, and in fact, the State Board has no statutory authority to even review these types of provisions. § 22–30.5–104(7)(b). The General Assembly expressly granted charter schools the authority to seek judicial enforcement of these contractual provisions, and also has allowed other parties to seek enforcement against delinquent charter schools. *Id.* Thus, if a charter school believes that its school district is failing to provide contracted-for services, either in the service provisions of the charter contract itself or in a separate service contract, the legislatively prescribed route for enforcement and relief is through the courts. *Id.*

---

3. We were not asked to grant certiorari with respect to the equal protection claims here, and accordingly we do not disturb the court of appeals' decision with respect to those claims.

4. For the balance of this opinion, we will refer to the types of contractual agreements entered into

pursuant to section 22–30.5–104(7)(b) as "facilities operation and maintenance" or "service." Additionally, we will refer to the types of agreements entered into pursuant to the statutory requirements of sections 22–30.5–105 through –107 as "governing policy."

### B. Governing Policy and Non-judicial Dispute Resolution

The governing policy provisions of a charter contract, made pursuant to section 22–30.5–105, are made up of the charter school application and all agreements and requests releasing the charter school from school district policies.[5] § 22–30.5–105(1)(3). Review of these governing policy provisions is limited to the appellate authority of the State Board. These provisions broadly encompass almost all aspects of the governance and policies of a charter school, including the curriculum, goals, objectives, pupil performance standards, employment policies, and budget. § 22–30.5–106. The charter school and the school district must agree on the state statutes and regulations, and district policies from which the charter school will be released. § 22–30.5–105(2)–(3). All such agreements must be specifically stated in the governing policy provisions of the charter contract, and any revisions of those provisions in the charter contract may be made only with the approval of the local board of education and the charter school's governing body. § 22–30.5–105(4).

The charter application is a proposed agreement requiring a mission statement from the proposed school, the goals, objectives, and pupil performance standards of the school, and evidence that an adequate number of parents, teachers, and pupils support the formation of the charter school. § 22–30.5–106(1)(a), (c). The charter application also requires a description of the charter school's educational program, a description of the charter school's plan for pupil performance evaluations, and evidence that the plan for the charter school is economically sound for both the school district as well as the school, including a proposed budget describing the manner in which an annual audit of the financial and administrative operations of the school is to be conducted. Id. at (e)-(g).

Finally, the application must include descriptions of the governance and operation of the school, the charter school's plans to meet pupil transportation needs, the enrollment policy, a dispute resolution process, an agreement between the parties regarding their respective legal liability and insurance coverage, and an explanation of the employment policies of the charter school. Id. at (h)-(m). All of these descriptions, plans, outlines, and policies, once approved, serve as the basis for the charter contract. § 22–30.5–105.

If a dispute arises over the implementation of one of the governing policy aspects of a charter contract discussed above, such a dispute is funneled into the administrative system embodied by section 22–30.5–108. See § 22–30.5–107.5. Under section 22–30.5–107.5, the parties to the charter contract must agree to a third-party dispute resolution process through which they may settle their disagreements. If either party chooses not to abide by the results of that process, or if no process is selected, the aggrieved party may seek review from the State Board through the method described in section 22–30.5–108. § 22–30.5–107.5.

■ The processes outlined in section 22–30.5–108 set forth a scheme of review in which the State Board has final, unappealable, authority. § 22–30.5–108(3)(d). Because the governing policy provisions of a charter contract are formed subject to the State Board's final authority, see § 22–30.5–107, the State Board has complete statutory authority to settle any disputes arising from implementation of those governing policy provisions of that contract. In essence, the governing policy provisions of the charter contract are not subject to judicial review. The State Board oversees those governing policy provisions of a charter contract agreed upon through the application process outlined in section 22–30.5–106, and ultimately decides how they are to be interpreted, applied, and enforced.

The General Assembly expressed its intent in the Act to create two separate systems of contractual dispute resolution, based upon the types of contractual agreements into which the parties enter. Having determined

---

5. As noted in our discussion above, a charter contract may be composed of two parts: the statutorily required governing policy provisions, and the separate facilities operation and maintenance provisions.

.

that charter schools have express authority to enforce service agreements, and that the State Board is the sole appellate authority for disputes arising from governing policy agreements, we now address whether the Act governs the case before us.

### III.

To determine whether the Act, as amended in 1999, governs the case here, we begin by addressing the effect of the explicit grant of standing in the 1999 amendment to the Act and then discuss the changes to the dispute resolution process.

### A. Clarification of the Right to Sue

In June 1999, the General Assembly enacted HB1274. In this bill, the General Assembly expressed its concern over what the State Board and courts perceived as the inability of charter schools to seek review of their facilities maintenance and operation contracts.

Section 22–30.5–104 states the requirements and powers of a charter school. In the 1998 version of that section, charter schools were required to be nonsectarian, tuition-free, subject to all federal and state laws, and administered and governed by a governing body, "As agreed to by the charter school applicant and its local board of education." § 22–30.5–104(1)–(4), 7 C.R.S. (1998). Further, a charter school had the power to enter into service contracts with a school district or any other third party for the use of a school building and grounds, the maintenance thereof, and the provision of services, activities, or undertakings "which the charter school is ordered to perform in order to carry out the educational program described in its charter." § 22–30.5–104(7)(b). By allowing charter schools to negotiate and enter into contractual service agreements, section 22–30.5–104 expanded the power of charter schools to contract beyond the statutorily required governing policy provisions in the charter contract. *Compare* § 22–30.5–104 *with* § 22–30.5–105, 7 C.R.S. (1998) *and* § 22–30.5–106, 7 C.R.S. (1998). Despite the express authority granted to enter into service contracts, the legislature did not expressly authorize charter schools to enforce those service contracts.

■ However, the lack of express authority does not necessarily imply that the legislature intended to deny charter schools the ability to enforce their facilities operation and maintenance contracts. *See* John D. Calamari and Joseph M. Perillo, *The Law of Contracts* 18 (3d ed. 1987)("A contract is void, a contradiction in terms, when it produces no legal obligation upon the part of a promisor.")[hereinafter *Calamari* ]. In fact, the power to enter into contracts assumes the ability to enforce those contracts. *Id.* at 2 ("definition of a contract is that it is a legally enforceable agreement"). In order to enforce a contract, one party must have some means of ensuring that the other party will obey its contractual duties. *See id.* at 1 ("The usual, but not inevitable, legal consequence [of a contract] is that performance of the promisee may be enforced in court by a decree."). As such, a legislative authorization to enter into contracts could be read as implying a complementary authorization to enforce those contracts. Therefore, the absence of express authority to enforce service contracts is inconsistent with the implication of authorization to contract.

The court of appeals held that because Academy is subordinate to its superior governmental body, the District, any implicit authority to sue arising out of the power to negotiate and contract does not extend to the power to sue the District. *Academy,* 994 P.2d at 444. The court of appeals looked to this court's holding in *Romer v. Fountain Sanitation District,* 898 P.2d 37 (Colo.1995), to reach the conclusion that "without a plain and unmistakable expression of legislative intent to the contrary, a subordinate agency may not litigate against a superior agency." *Academy,* 994 P.2d at 444. Accordingly, the court of appeals held that Academy has no standing to sue the District for enforcement of the charter contract in this case. *Id.* at 445.

■ The prohibition on allowing subordinate agencies to sue their superior governmental bodies without express legislative intent is a judge-made rule. *Romer v. Bd. of County Comm'rs of the County of Pueblo,* 956 P.2d 566, 573 (Colo.1998). Such a rule

exists so that courts do not unnecessarily intrude into matters more properly committed to resolution in another governmental branch. *Id.* Our rule ensures that, unless the General Assembly has specifically declared its intent that courts are to resolve intra-agency disputes, such disputes will be better saved for determination through the political process. *Id.* Thus, without a plain and unmistakable expression of legislative intent, the judiciary will not expand the rights of a subordinate agency to sue its superior governmental body. *Id.* Stated more plainly, "in the absence of an express statutory right, a subordinate agency … lacks standing or any other legal authority to obtain judicial review of an action of a superior state agency." *Id.* at 574 (citing *Martin v. Dist. Court*, 191 Colo. 107, 109, 550 P.2d 864, 866 (1976)).

As discussed above, section 22–30.5–104(7)(b), 7 C.R.S. (2000), expressly grants charter schools standing to sue for enforcement of facilities operation and maintenance contracts entered into pursuant to that paragraph (b). The language explicitly granting standing was not added to that section until the amendment offered in House Bill 99–1274 (HB1274 or the Amendment) in 1999. Legislative approval of HB1274 thus ensured that charter schools could sue their superior local school districts. Recognizing that we have held that without express statutory authority subordinate bodies do not have standing to sue, we next consider whether the legislature meant to clarify the implied authority to sue given to charter schools.

Amendments to a statute either clarify the law or change it, *Douglas County Bd. of Equalization v. Fid. Castle Pines, Ltd.*, 890 P.2d 119, 125 (Colo.1995), and there exists a presumption that, by amending the law, the legislature intends to change it. *Corsentino v. Cordova*, 4 P.3d 1082, 1091 (Colo.2000). This presumption can be rebutted, however, by a showing that the legislature only meant to clarify an ambiguity in the statute by amending it. *Id.* If an amendment clarifies the law, the law then remains unchanged. *People v. Covington*, 19 P.3d 15, 21 (Colo.2001). Accordingly, to determine whether an amendment changed the law or

merely clarified it, we look to the legislative history surrounding an amendment, we consider the plain language used by the General Assembly, and we determine whether the provision was ambiguous before it was amended.

In a hearing before the House Committee on Education (the Committee), Representative Keith King introduced HB1274, stating that those portions of the Amendment relating to standing to sue "clarify the fact that if a charter school has the authority to sign a contract, it also has the authority to enforce the contract." *Hearing on House Bill 99–1274, Before the House Committee on Education*, 62d General Assemb., 1st Sess. (hearing tape, Feb. 8, 1999, 2:19 p.m.—3:50 p.m.)[hereinafter *Education Committee*]. King continued explaining HB1274, stating "that once the contract is entered into on both sides … be it the school district or be it the charter school, [the parties] have the necessity to live up to the contract that they sign, and if they choose not to live up to the contract that is signed, the other party in this case has an opportunity to sue them for nonperformance of [the] contract." *Id.* at 2:19 p.m.

Following King's introduction of the Amendment, committee members heard testimony from Ken Griffith, Executive Director of Academy, concerning the dispute between Academy and the District. Griffith expressed his frustration over both the State Board's decision that jurisdiction to hear Academy's claims lay in the district court and the district court's refusal to hear the case because of the lack of express statutory authority to sue. Griffith explained to the committee that "our biggest concern is how do we get this resolved if the state board won't resolve it, if our district won't resolve the issue with us, [and] if the courts won't resolve it." *Id.* at 2:39 p.m.

In light of the district court's refusal to hear the merits of Academy's case, and the fear that such a decision would set a precedent denying charter schools the ability to enforce contracts, the Committee members felt it necessary to include in the Amendment a legislative declaration stating that HB1274 is a clarification of the right of a charter

school to bring suit. When presenting this legislative declaration to the Committee, Representative King reinforced the idea that the provisions in HB1274 amending sections 22–30.5–104 and –105 were meant to clarify the existing law, not to change it.

> This is a legislative declaration. And basically what this says is that charter schools have had the opportunity to enter into a contract and that contract is an agreement that is done between the charter school and the local school board, and it is the intent when both parties [enter] into a contract that it is enforceable. If they don't live up to it they can suffer consequences for not living up to it. So basically what this declaration says, that ever since the charter school act has started, is that contracts are binding and that they are binding on both parties and that all 60 of the charter schools to this particular point and time have effective contracts and that they are actual agreements that have been signed by both the school district and the charter school and that they, in both cases on both the charter school and the school district should perform up to those agreements.

By approving the legislative declaration in section 1 of the Amendment, the Committee believed that its intent to clarify the law was made clear. The legislative declaration states:

> The general assembly hereby *clarifies* its intent that, in empowering charter schools to enter into contracts pursuant to section 22–30.5–104, Colorado Revised Statutes, and in identifying a charter school's charter and the local board of education, pursuant to section 22–30.5–105, Colorado Revised Statutes, such contracts are enforceable and the parties to such contracts may obtain such remedies for the violation of such contracts as are provided by law.

Ch. 302, sec. 1, 1999 Colo. Sess. Laws 1255 (emphasis added). As per the desires of the Committee, such a declaration insinuates that the General Assembly, finding charter schools' powers unacceptably limited by recent State Board and district court decisions, wanted to make clear the powers that char-

ter schools actually have and should have. Prior to this legislative declaration, the Act implied that charter schools had the right to enforce contracts but did not expressly provide for such a right. Thus, the Act was ambiguous before the 1999 changes.

The statements made in Committee, the legislative declaration, and the earlier ambiguity of the Act, provide convincing evidence that the General Assembly, when amending the Act, meant for the Amendment to serve merely as a clarification, not as a substantive change of the law. Accordingly, we conclude that the General Assembly intended that charter schools have always had standing to sue their school districts for the types of contractual provisions described in section 22–30.5–104(7)(b). Thus, we are no longer concerned that we might invade legislative power by implying a legislative intent to authorize charter schools to sue their school districts. Therefore, we hold that a charter school is authorized to sue its district to enforce service agreements. Having established that the amendment of section 22–30.5–104 clarified that charter schools may sue their districts, we now turn to the analysis of the newly enacted section 22–30.5–107.5 to determine whether it is a retroactive change or an unconstitutionally retrospective change to the Act.

### B. Changes in Dispute Resolution Processes

Prior to the adoption of HB1274. section 22–30.5–106, 7 C.R.S. (1998), did not contain any requirement that a charter application include a dispute resolution process. Instead, the State Board retained supervisory power over any local school district decisions related to charter schools through section 22–30.5–108, 7 C.R.S. (1998). However, with the adoption of HB1274, the General Assembly added the requirement that a charter application include a dispute resolution process as provided in section 22–30.5–107.5, 7 C.R.S. (2000). § 22–30.5–106(m), 7 C.R.S. (2000).

In section 22–30.5–107.5 of the Act, the General Assembly provided for a means of dispute resolution between charter schools and their school districts for disputes arising

from implementation of the governing policy provisions of a charter contract. § 22–30.5–107.5(1). The section requires that a charter school and a school district agree upon a third-party dispute resolution process in the charter contract. *Id.* If the two parties fail to designate such a process, the State Board may, at the request of either party, direct the department of education to provide dispute resolution services. *Id.* Furthermore, subsection (2) delineates the appeal process for dispute resolution. § 22–30.5–107.5(2). If a party chooses either not to participate in dispute resolution, or fails to abide by the result of the resolution process, an alleged unilateral imposition of conditions occurs. *Id.* Such imposition may be appealed to the State Board whose decision is final and not subject to appeal. *Id.;* § 22–30.5–108(3)(d).

The introduction of section 22–30.5–107.5 to the Act in 1999 was necessary to establish a process through which charter schools could seek review over the governing policy provisions in their charter contracts through appeal to the State Board. The pre-amendment Act did not explicitly state the means for resolution of a governing policy charter dispute. Instead, the Act detailed the charter application process, § 22–30.5–107, 7 C.R.S. (1998), and then detailed the standard of review and procedures of appeals to the State Board. § 22–30.5–108, 7 C.R.S. (1998). Without any direction as to how a charter school should seek resolution of disputes with the school district over the governing policy portion of the charter contract, schools and districts were forced to invent their own dispute resolution processes.

■■■ By adding section 107.5 to the Act, the General Assembly established the processes for settling governing policy contract disputes, as well as explicitly establishing the situations in which the State Board had appellate review. Though the legislature attempted to include this section within the purview of the legislative declaration that HB1274 served to clarify the Act, we hold that the presumption that an amendment is intended to change the law has not been rebutted. *See Covington,* 19 P.3d at 21. Despite expressly recognizing two other sections as clarifications, the legislative declaration in HB1274 fails to specifically name section 22–30.5–107.5 as one of the portions of the statute which serves as a clarification. Furthermore, this section is a procedural addition adding specific new contractual requirements to the Act that did not previously exist. Accordingly, we hold that the enactment of section 22–30.5–107.5 served as a change to the law of charter contract dispute resolution.

The amendment at issue here was enacted in 1999, before the court of appeals issued its holding in this case. The parties argue whether the enactment of section 22–30.5–107.5 applies in this case, or whether it is retrospective, and thus, unconstitutional. *See Zaragoza v. Dir. of Dep't of Revenue,* 702 P.2d 274, 276 (Colo.1985)("The Colorado Constitution prohibits the enactment of retrospective legislation."); Colo. Const. art. II, § 11. Therefore, we must determine whether the Amendment to the Act applies retroactively here, or whether it is meant to be merely prospective.

■■■ There is a statutory and common-law presumption that legislation is prospective unless intent to the contrary is shown. § 2–4–202, C.R.S. (2000); *Curtis v. McCall,* 79 Colo. 122, 123, 244 P. 70, 71 (1926). If the legislature wishes for legislation to be applied retroactively, it must clearly intend to do so. *Coffman v. State Farm Mut. Auto. Ins. Co.,* 884 P.2d 275, 279 (Colo. 1994). Accordingly, if the General Assembly amends a law, which results in substantive changes to that law, the legislation will apply prospectively unless the intent for retroactivity is clear. Here the legislature's intent to clarify charter schools' standing to sue, and its response to the district court decision in this case, provide convincing evidence of the legislature's intent to apply these changes retroactively.

Relative to section 22–30.5–107.5, the parties here have already established a dispute resolution process. Thus, this new section only provided for appellate review of that dispute resolution process. By changing the law, the legislature not only prospectively changed the requirements for a charter contract, but also retroactively added the means for appellate review. *See Zaragoza,* 702 P.2d

at 276 ("[A]pplication of a statute is not rendered retroactive and unlawful merely because the facts upon which it operates occurred before the adoption of the statute." (internal quotation marks omitted)).

■ The District argues that any application of section 107.5 to this case unconstitutionally impairs the charter contract. In the charter contract, Academy and the District negotiated a dispute resolution clause which left the District's board of education (the District Board) the right to resolve disputes between the District and Academy. The charter contract provides that disputes should first be submitted to the superintendent of the District, then should undergo good-faith negotiations, and finally, if the parties cannot reach a result, "they shall submit the matter to the board for its consideration." Any decision rendered by the District Board is to be final. The District contends that, if the portion of the Amendment here is retroactive, it will strip the District of its contracted rights, and will strip the District Board of education of its reserved rights to resolve any charter contract disputes.

The District's argument fails for two reasons. To begin, no unconstitutional new duty or obligation has been imposed upon the District by this section in the Amendment. Instead, the General Assembly chose to detail the process through which parties who were unsatisfied with the resolution of their disputes could appeal that resolution. Appellate review by the State Board of a local board of education decision does not render the local board's decision any less final. In fact, the ability to appeal from a final decision here mirrors the requirement that a district court judgment be final before the court of appeals has jurisdiction over an appeal. § 13–4–102(1), 5 C.R.S. (2000). Thus, the mere ability to seek an appeal of the District Board's final decision does not abrogate the contractual agreement that the District Board's decision "shall be final." Instead, this statutory provision clarifies the processes necessary to achieve an adequate resolution to governing policy contractual disputes.

Similarly, the District's argument also fails because the portion of the Amendment at issue here does not substantively affect the rights of the parties. As discussed above, subsection 1 of section 22–30.5–107.5 details the type of dispute resolution process that the parties should negotiate for in the charter contract. It does not require that either party make concessions to the other, but merely requires that they agree upon a mutually acceptable third party dispute resolution process. The parties in this case have already chosen a dispute resolution process in their charter contract. Therefore, the addition of appellate review by the State Board of the outcome of that dispute resolution does not create any new obligations or duties on the part of either Academy or the District, but instead affords both parties the opportunity to seek final impartial review from an agency specially suited to resolve such disputes. Further, contrary to the District's contentions, this new section does not attach a new disability with respect to past transactions. *See Ficarra v. Dep't of Regulatory Agencies*, 849 P.2d 6, 16 (Colo.1993). It merely allows both parties to seek dispute resolution beyond the preliminary process to which they originally agreed. Thus, because this statute is procedural in effect, the retroactive application of the change to the facts in the case at hand does not unconstitutionally impair the contract. *See Cont'l Title Co. v. Dist. Court*, 645 P.2d 1310, 1314–15 (Colo.1982)("[A]pplication of a statute to a subsisting claim for relief does not violate the prohibition of retroactive legislation where the statute effects a change that is only procedural or remedial in nature.").

Having determined that section 22–30.5–104, as amended, is a clarification of the Act, and that section 22–30.5–107.5 constitutes a retroactive change to the Act, we now apply those sections to the case at hand.

## IV.

Academy's complaint alleges that the District has violated several aspects of the charter contract agreed upon by both parties. The service provisions in the charter require the provision of services amounting to twenty percent of the PPOR. These provisions are exactly the type of facilities operation and maintenance contractual agreements de-

scribed and authorized by section 22–30.5–104(7)(b). However, the charter contract also includes the statutorily mandated governing policy provisions. Those governing policy provisions of the charter contract, entered into pursuant to section 22–30.5–107, delineate the duties of both parties with respect to the establishment and maintenance of the charter school. Academy alleges that the District has violated both types of contractual provisions here. We begin our analysis of Academy's claims with the service provisions entered into pursuant to section 22–30.5–104(7)(b).

### A. Right to Sue for Failure to Provide Contract Services

Section 22–30.5–104(7)(b) expressly authorizes charter schools to sue their school districts for enforcement of any facilities operation and maintenance contract created pursuant to that paragraph (b). Under paragraph (b), a charter school may enter into a service contract with a school district for the use of a school building and grounds, operation and maintenance of that building or grounds, "and the provision of any service, activity, or undertaking that the charter school is required to perform in order to carry out the educational program described in its charter." § 22–30.5–104(7)(b).

Academy's claims against the District are directly related to the types of service contracts authorized by section 22–30.5–104(7)(b). Though the service provisions at issue here are found in the charter contract, they are distinct from the statutorily mandated governing policy provisions also found in the charter contract. The provisions at issue all relate to the types of services for which Academy could contract under section 22–30.5–104(7)(b). The particular claims relating to the twenty percent of the PPOR are for enforcement of contractually negotiated services that the District has allegedly failed to provide.

Thus, because the express authority to sue its host school district is found in the plain language of section 22–30.5–104(7)(b), and because the services at issue are clearly controlled by section 22–30.5–104(7)(b), Academy has standing to sue for enforcement of those contractual claims under paragraph (b). We now turn to analysis of Academy's other claims.

### B. Non-judicial Resolution of Governing Policy Claims

According to section 22–30.5–105, the charter contract between a charter school and its local district reflects all agreements releasing the charter school from school district policies. The governing policy provisions in the charter contract also reflect all requests for release of the charter school from state statutes and regulations. As we have discussed above, if disputes arise from the implementation of the governing policy provisions of a charter contract, such disputes may eventually be appealed to the State Board pursuant to section 22–30.5–108, and any decision rendered by the State Board under section 22–30.5–108 is final and not subject to appeal. § 22–30.5–108(3)(d).

Academy's non-service related claims against the District stem directly from the statutory and contractual duties described in sections 22–30.5–105 through –107, and embodied in the governing policy agreements in the charter contract. As noted above, section 22–30.5–107.5 retroactively applies to the facts of this case, and, as such, requires that any disputes arising from the implementation of the governing policy provisions in the charter contract, as described in sections –105 and –106, are to be resolved according to a contractually agreed upon method of third party dispute resolution. Here the parties have already agreed upon a dispute resolution process which they have followed in seeking relief of their claims.

Additionally, section 22–30.5–107.5 allows an aggrieved party to seek appellate review of its claims from the State Board. If Academy, dissatisfied with the result of its agreed upon dispute resolution process, so wishes, it may seek State Board review of that resolution. § 22–30.5–107.5. However, section 22–30.5–108(3)(d) provides that, once the State Board has reached its decision, that decision is final and unappealable. The legislature has made it clear that charter schools do not have standing to sue their superior

school districts for disputes arising from implementation of the governing policy provisions in their charter contracts as described in sections 22–30.5–105 and –106. Thus, the only means to seek relief that is available to charter schools is through the administrative process involving the State Board. Because the General Assembly has not granted standing to charter schools for these types of governing policy claims, courts lack jurisdiction to hear them. Accordingly, Academy's claims stemming from implementation of the governing policy portions of the charter contract, as described in sections 22–30.5–105 and –106, cannot be brought in the district court.

### C. The Association's Standing

■ The Association claims that, regardless of whether the charter school has standing to sue the District, the Association, as the party who contracted with the District in the original charter contract, has standing to enforce that contract. The Association argues that it is a party to the contract, and that the contract establishes duties of the Association and of the District. The Association also argues that associations, generally, have power to sue. Thus, the Association argues that the court of appeals erred when it held that the Association was the same party as Academy, and that Academy could not be a party to the contract and a third-party beneficiary at the same time. *Academy,* 994 P.2d at 446. We do not agree with Association's assertions.

It is clear from the court of appeals' decision that Academy previously argued that the Association, as a third party, had standing to enforce the charter contract for the benefit of Academy. *Id.* In dismissing this argument, the court of appeals noted that the district court found that Academy and the Association were the same entity and, as such, could not be both party to the contract and a third party. *Id.* In its briefs submitted to this court, Academy does not argue that the Association may sue the District on behalf of Academy as a third-party. Instead,

as noted above, Academy argues that the Association is an actual party to the contract.

The record in this case is unclear as to the parties to the charter contract. In the introductory paragraph of the charter contract, the contract states that it is "entered into by and between the School District No. 12, Adams County ('School District') and the Academy of Charter Schools, a voluntary association of citizens who have submitted an application for a Charter School ('School')." The actual language in the contract, however, belies this initial assertion, discussing agreements between the School and the School District, for example, "the School agrees to waive its curricular requirements," and "the School acknowledges and agrees that it is subject to the provisions of the Colorado Open Meetings Law." Furthermore, the contract is signed by the purported Board of Directors of "Academy of Charter Schools."

An addendum to the charter contract, dated the same day, states that it was "made and entered into by and between School District No. 12, Adams County ('School District') and the Academy of Charter Schools ('School')." This addendum is also signed by the same purported members of the Board of Directors of "Academy of Charter Schools." It appears that the Association, if it played any role at all, only served to negotiate between the District and Academy, and that Academy is the actual party to the contract. To the extent that the Association argues that the reference to the voluntary association of individuals could be reasonably interpreted to mean that the Association is a party to the contract, we hold that such an interpretation is unreasonable because it implies that the charter school itself is not a party to the contract.

Our conclusion is supported by the statement in section 22–30.5–105 that "an approved charter application shall serve as the basis for a contract between the charter school and the local board of education."[6] The record in this case makes it clear that

---

6. We do not mean to imply that individuals or entities attempting to form a charter school are never parties to the contract in addition to the charter school itself and the school district. Our holding here is merely limited to the facts before us and does not reach a determination of whether all charter contracts are limited only to charter schools and school districts.

the Association is not a party to the charter contract, and the charter contract was not made in the Association's name for the benefit of Academy. Furthermore, the only purpose served by the Association here was to allow a group of parents to apply for a charter school. Though some of those individuals may now be the individually named plaintiffs in this action, they also were not parties to the charter contract. The individuals who signed the charter contract signed as members of the Academy of Charter Schools Board of Directors. As such, it is Academy, not the Association, that is party to the contract with the District. Accordingly, the Association lacks standing. *See* C.R.C.P. 17(a).

### V.

In conclusion, the 1999 amendments to section 22–30.5–104 were clarifications of the law, and not changes. As such, Academy has standing to enforce the facilities operation and maintenance and service portions of the contract relating to the provision of services equal to twenty percent of its PPOR. The power to enter into those contractual service provisions stemmed from the grant of authority in section 22–30.5–104(7)(b), and therefore, the ability to seek judicial enforcement of that service contract also stems from that section.

However, as to Academy's governing policy claims, the enactment of section 22–30.5–107.5 served as a retroactive change to the Act. Because that section authorizes an aggrieved party to seek appellate review from the State Board, and because the State Board's decision is not subject to review, Academy lacks standing to pursue its claims concerning the governing policy provisions of the charter contract. Finally, as to the Association's standing to sue the District, the Association was not a party to the charter contract, and thus, may not seek enforcement of that contract.

Accordingly, we reverse the court of appeals' judgment insofar as it denied Academy standing to pursue its service contract claims and remand this case with directions to allow the parties to litigate the service claims. However, we affirm that portion of the court of appeals' decision dismissing Academy's claims, as related to the governing policy provisions entered into under the sections 22–30.5–105 and –106, for a lack of standing. We also affirm the court of appeals' conclusion that the Association lacks standing to enforce the charter contract with the District. Therefore, we remand this case to the court of appeals for return to the district court for further proceedings consistent with this opinion.

Justice BENDER does not participate.