Valerie POWELL, natural parent of decedent Steven Powell, individually; and James Powell, by and through his conservator, Mark Elliott, Plaintiffs–Appellants,

v.

CITY OF COLORADO SPRINGS, Defendant–Appellee.

No. 03CA2030.

Colorado Court of Appeals, Div. V.

Sept. 8, 2005.

Certiorari Granted April 10, 2006.

Melat, Pressman & Higbie, LLP, Glenn S. Pressman, Colorado Springs, Colorado, for Plaintiffs–Appellants.

Patricia K. Kelly, City Attorney, Shane White, Senior Attorney, Colorado Springs, Colorado, for Defendant–Appellee.

CRISWELL [*], J.

Plaintiffs, Valerie Powell, individually and as the natural parent of Steven Powell, deceased, and Mark Elliott, as the conservator of James Powell, appeal the trial court's judgment dismissing their complaint against defendant, the City of Colorado Springs (City). They contend that the trial court erred in concluding that the General Assembly clearly intended the 2003 legislation amending the Colorado Governmental Immunity Act (GIA), § 24–10–101, et seq., to expressly exclude storm water facilities from the definition of "public sanitation facility" to

be retroactive. We agree. Therefore, we reverse and remand with directions.

The factual background of this dispute is described in the supreme court's opinion in a prior appeal of this case, *City of Colorado Springs v. Powell,* 48 P.3d 561 (Colo.2002)(*Powell II* ), which reflects the following:

Steven Powell met his death and James Powell was seriously injured when they both fell into a storm ditch owned and operated by the City. James was able to get himself out of the ditch; however, Steven was swept downstream where his body was later found.

Plaintiffs brought common law negligence claims against the City and the owner of the property adjoining the drainage ditch. Plaintiffs alleged that the ditch was part of a storm water drainage system owned and maintained by the City and that certain features of the area surrounding the ditch created a dangerous condition.

The City moved to dismiss plaintiffs' complaint or, in the alternative, for summary judgment, arguing that it had immunity from suit under the GIA. The trial court initially denied the City's motion, concluding that there were sufficient allegations in the complaint to provide the court with subject matter jurisdiction. The City then initiated an interlocutory appeal pursuant to § 24–10–108, C.R.S.2004.

On that appeal, a division of this court held that the City's "negligent failure to maintain the area surrounding the drainage ditch may have contributed to Steven's death and James' injuries." *Powell v. City of Colorado Springs,* 25 P.3d 1266, 1268 (Colo.App.2000)(*Powell I* ). The division concluded that this allegation was sufficient to overcome the City's claim of immunity. Under this allegation, the injuries resulted from either the operation and maintenance, or the dangerous condition, of a public sanitation facility.

Upon certiorari, the supreme court held that the drainage ditch was a "sanitation facility" within the meaning of the GIA. The

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2004.

court also held that liability for the operation and maintenance of such a facility was not limited to acts or omissions taking place within the facility and that injuries allegedly resulting from an act or omission that was otherwise directed toward the purpose of the facility was sufficient to establish a waiver of immunity. *Powell II, supra.*

Shortly thereafter, the supreme court reached the same conclusion in a case also involving the death of a young boy in a drainage ditch. *City of Longmont v. Henry–Hobbs*, 50 P.3d 906 (Colo.2002).

The appeals in each of these cases were taken pursuant to § 24–10–108, C.R.S.2004. Thus, each of the foregoing determinations had the effect of finally resolving the issue of the district court's jurisdiction, leaving nothing further to be decided with respect to that issue. While other issues presented by the pending litigation remained to be resolved, their determination could not affect the supreme court's resolution of that issue.

In response to these two opinions, the General Assembly adopted legislation, Colo. Sess. Laws 2003, ch. 182, § 24–10–103(5.5) at 1343–44 (House Bill 03–1288), which added new definitions under the GIA for "public sanitation facility," "public water facility," and "maintenance" and amended the existing definitions for "operation" and "dangerous condition." The new definition of "public sanitation facility" expressly excludes storm water facilities.

After the enactment of these amendments, the City again moved to dismiss plaintiffs' claims, alleging that the new statute should be applied retroactively to this case. The trial court agreed and dismissed plaintiffs' claims.

■ Absent expressed legislative intent to the contrary, a statute is presumed to operate only prospectively. *In re Estate of DeWitt*, 54 P.3d 849 (Colo.2002); *see also* § 2–4–202, C.R.S.2004. To overcome the presumption of prospectivity, the statute must clearly reveal a legislative intent to have the statute applied retroactively. *Ficarra v. Dep't of Regulatory Agencies*, 849 P.2d 6 (Colo.1993).

■ There is also a presumption that, when the legislature amends a statute, it intends a change in the existing law. *Douglas County Bd. of Equalization v. Fidelity Castle Pines, Ltd.*, 890 P.2d 119 (Colo.1995). This presumption may be rebutted only by a showing that the General Assembly intended to clarify an existing ambiguity in that law. *Acad. of Charter Schs. v. Adams County Sch. Dist. No. 12*, 32 P.3d 456 (Colo.2001). Thus, if an amendment clarifies such an ambiguity, the law remains unchanged by the amendment, *see Corsentino v. Cordova*, 4 P.3d 1082 (Colo.2000), and it may provide convincing evidence of the legislature's intent to apply the amendment retroactively. *Acad. of Charter Schs. v. Adams County Sch. Dist. No. 12, supra.*

■ Hence, to determine whether an amendment clarifies or changes a statute, we examine the plain language used by the General Assembly, the legislative history surrounding the amendment, and any ambiguity in the provision before it was amended. *Acad. of Charter Schs. v. Adams County Sch. Dist. No. 12, supra.* In considering these factors here, we conclude that there is no clear legislative intent that the pertinent statute was to be applied retroactively.

As noted, House Bill 03–1288 added new definitions for "public sanitation facility," "public water facility," and "maintenance" and amended the existing definitions for "operation" and "dangerous condition." However, the General Assembly did not expressly state that the new definitions were applicable to injuries occurring before the effective date of the legislation. It simply stated that the legislation "shall take effect on July 1, 2003," Colo. Sess. Laws 2003, ch. 182, § 3 at 1344; it made no reference to accrued claims, to pending lawsuits, or to its intended effect on cases already adjudicated.

Thus, the plain language of the amendments does not indicate that the General Assembly intended the legislation to have retroactive effect. *See Z.J. Gifts D–2, L.L.C. v. City of Aurora*, 93 P.3d 633 (Colo.App.2004)(because statutory language did not specify that amendment was to be applied retroactively, division declined to attribute an intent to enact a retroactive

amendment); *cf. In re Trust of Franzen,* 955 P.2d 1018 (Colo.1998)(General Assembly expressly stated that power of attorney statute did not invalidate any agency or power of attorney executed prior to its effective date).

In enacting the amendments at issue here, the General Assembly noted in its legislative declaration that the Colorado Supreme Court in *Powell II* and *Henry–Hobbs* had interpreted key terms in the GIA "in a manner that *may* significantly expand the potential liability of governmental entities providing utility services to the public." The legislative declaration also stated that "[a]s a result of these court decisions, *modifications of, and additions to,* the definitions contained in the 'Colorado Governmental Immunity Act' are necessary to *clarify* the intent of the general assembly in adopting the Act." Colo. Sess. Laws 2003, ch. 182, § 2(c) at 1343 (emphasis added).

Although the General Assembly used the word "clarify" in this declaration, it also noted that modifications and additions to the definitions contained in the GIA were required to accomplish that clarification. Thus, while such language expresses the General Assembly's disagreement with the decisions in *Powell II* and *Henry–Hobbs,* it should be interpreted as indicating that the General Assembly intended to correct the effect of those decisions only prospectively. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 307 n. 7, 114 S.Ct. 1510, 1516, 128 L.Ed.2d 274, 286 (1994)(in analyzing whether legislation amending civil rights act was retroactive, court noted that "[w]e do not suggest that Congress' use of the word 'restore' necessarily bespeaks an intent to restore *retroactively* " (emphasis original) ); *see also* Norman J. Singer, *Sutherland on Statutory Construction* § 27.4, at 472 (6th ed. 2002)("The usual purpose of a special interpretive statute is to correct a judicial interpretation of a prior law which the legislature considers inaccurate.").

Therefore, even if we assume that the General Assembly viewed the *Powell II* and *Henry–Hobbs* decisions as representing a departure from the General Assembly's previous understanding of the meaning of "sanitation facility" under the GIA, we do not view the language used in the legislative declaration as constituting a clear expression of the General Assembly's intent to reach cases that arose before the enactment of House Bill 03–1288.

In addition, our review of the legislative history of the amending statute convinces us that this history is ambiguous with respect to the issue before us. *See* Hearings on H.B. 03–1288 before the House Committee on Judiciary, 64th General Assembly, 1st Session (Feb. 13, 2003); Hearings on H.B. 03–1288 before the Senate Committee on Judiciary, 64th General Assembly, 1st Session (Mar. 5, 2003).

■ We note, however, that, to the extent that this legislative history contains expressions by legislators in 2003 of the intent of their predecessors of forty years earlier, such expressions are inherently unreliable. *See, e.g., Bridgestone/Firestone, Inc. v. Pension Benefit Guar. Corp.,* 892 F.2d 105, 110 n. 5 (D.C.Cir.1989)("[T]he pronouncements of a subsequent Congress, here 13 years after the passage of ERISA, are notoriously unreliable indicators of the intent of Congress at the time of passage, and we give very little weight to such revisionist legislative history.").

Further, there was little, if any, ambiguity in the meaning of "sanitation facilities," even before the supreme court's recent decisions.

Long prior to the adoption of the GIA, the supreme court had determined that municipalities were liable for injuries resulting from the negligent construction or maintenance of their drainage facilities. *See Malvernia Inv. Co. v. City of Trinidad,* 123 Colo. 394, 229 P.2d 945 (1951); *City of Denver v. Capelli,* 4 Colo. 25 (1877). Given these prior decisions, the court must have been expected to conclude that such facilities fall within the concept of "sanitation facilities" for purposes of municipal liability under the GIA.

Although until the supreme court issued its prior opinion in this case, that court had not had an opportunity to determine the reach of this phrase, a division of this court had, some ten years earlier, concluded that a storm drainage facility was a "sanitation facility" under the GIA. *Burnworth v. Adams County,* 826 P.2d 368 (Colo.App.1991). And al-

though the General Assembly amended the GIA several times after the *Burnworth* case was decided, none of those amendments changed the interpretation placed upon the statute by the division until 2003, after the supreme court had endorsed this interpretation.

Hence, as of the date of the adoption of the pertinent amendment, the meaning of the statutory term was not ambiguous. "Sanitation facility" included a storm drainage system. *See Castillo v. State,* 110 Nev. 535, 542, 874 P.2d 1252, 1257 (1994) ("[A]fter the supreme court of a state has interpreted the statute in question, it is no longer ambiguous and therefore cannot be clarified by the Legislature."), *disapproved of on other grounds by Wood v. State,* 111 Nev. 428, 892 P.2d 944 (1995).

■ Finally, a statute should be interpreted, if possible, in a manner that will not render it unconstitutional. *Buckley v. Chilcutt,* 968 P.2d 112 (Colo.1998); *Meyer v. Putnam,* 186 Colo. 132, 526 P.2d 139 (1974). And to interpret the statutory amendments here to be retroactive, so as to reverse the prior opinion of the supreme court in this case, might well cause those amendments to be unconstitutional, at least as applied to these plaintiffs.

*Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), involved an attempt by Congress to extend the statute of limitations for prosecution of private claims for alleged violations of the Securities and Exchange Act, after the United States Supreme Court had ruled that a one-year statute applied to such actions. That legislation purported to make the extended time applicable to actions in which a final judgment had been entered dismissing such claims on the basis of the one-year statute. This retroactive aspect of the legislation was challenged on two bases: that it offended against the principles of the separation of governmental powers and that it was a denial of due process of law under the Fifth Amendment. Because the former ground was the narrower one and because a decision upon the due process challenge might have affected the validity of similar state legislation under the Fourteenth Amendment, the Court addressed only the argument based upon the separation of powers. Nevertheless, it held that the Congressional attempt to permit the setting aside of final judgments and the application of the new statute to cases in which such judgments had been rendered was violative of this fundamental precept.

In doing so, the Court noted that, prior to the adoption of the Constitution, colonial legislatures had a practice of enacting private bills that had the effect of vacating a previously entered final judgment and authorizing a new trial. The reaction to this practice, according to the Court, was the adoption of a system separating the judicial and legislative powers. Thus, according to *Federalist Papers No. 81* 545 (J. Cooke ed., 1961): "A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases." Hence, according to the Court, when a law requires its application to "a case already finally adjudicated," the legislature, in adopting such a law, is attempting improperly to act in a judicial, not in a legislative, capacity. *Plaut v. Spendthrift Farm, Inc., supra,* 514 U.S. at 225, 115 S.Ct. at 1456.

Other courts have reached similar conclusions. *See, e.g., Bush v. Schiavo,* 885 So.2d 321 (Fla.2004); *Marine Power & Equip. Co. v. Washington State Human Rights Comm'n,* 39 Wash.App. 609, 615, 694 P.2d 697, 700 (1985)("[t]he Legislature may not, under the guise of clarification, overrule by legislative enactment a prior authoritative Supreme Court opinion construing a statute").

The *Plaut* decision was based only on the separation of powers doctrine recognized by the federal constitution, and this doctrine is not guaranteed to the states. *In re Interrogatories Propounded by Senate,* 189 Colo. 1, 536 P.2d 308 (1975). Nevertheless, the Colorado Constitution explicitly provides for three "distinct departments—the legislative, executive and judicial," and it specifically prohibits the personnel in one department from exercising "any power belonging to either of the others." Colo. Const. art. III.

■ Hence, legislation purporting to authorize persons outside the judicial department to exercise judicial power is void. *City & County of Denver v. Lynch*, 92 Colo. 102, 18 P.2d 907 (1932)(statute making county judge's decision subject to approval by county commissioners is invalid); *Bd. of County Comm'rs v. Indus. Comm'n*, 650 P.2d 1297 (Colo.App.1982) (Industrial Commission rule cannot reverse court decision interpreting statute; interpretation of statute is a judicial function), *rev'd on other grounds*, 690 P.2d 839 (Colo.1984).

■ We conclude, therefore, that the *Plaut* analysis of the separation of powers doctrine under the federal constitution is equally applicable to a consideration of the proper exercise of governmental powers under the state constitution.

The *Plaut* Court drew a distinction, for purposes of the separation of powers analysis, between a law affecting a final judgment and one that is to be applied to pending unresolved cases. We will assume, arguendo, that such a distinction is also significant in any due process analysis, although we need not address any due process claims to decide this case.

Further, while the City argues that there had been no "final judgment" entered in this case before the statutory amendments were adopted, we reject that assertion.

It is certainly true that, at the time of the adoption of the new definitions, a judgment disposing of *all* the issues raised in this case had not been entered. However, after the trial court had initially denied the City's motion to dismiss, the City chose to appeal that decision pursuant to § 24–10–108. That statute provides that a district court's decision respecting its jurisdiction over a claim under the GIA "shall be a *final judgment* and shall be subject to interlocutory appeal" (emphasis supplied).

■ Of course, a decision only upon a jurisdictional issue is not a "final judgment" in the traditional sense, and this statute only authorizes, it does not require, an immediate appeal from such a decision. *Walton v. State*, 968 P.2d 636 (Colo.1998). Nevertheless, the purpose of this legislative enactment is to assure that an immediate appeal can be taken; it is a substitute for an appeal after a certification under C.R.C.P. 54(b), which can be taken only with the trial court's permission. *Walton v. State, supra.* This being the case, then, a determination of the jurisdictional issue by the appellate court is just as final and binding a "judgment" as is the appellate court's final determination of a separate claim after a C.R.C.P. 54(b) certification. In neither instance is there a "final judgment" disposing of the entire case, but in both instances the decision of the appellate court upon the issues presented is a final and binding judicial determination; those issues cannot be revisited in later proceedings.

■ We conclude, therefore, that, for purposes of the application of the doctrine of the separation of governmental powers, any resulting final appellate determination of the jurisdiction of the court under the GIA, rendered in a proceeding under § 24–10–108, must be treated as a final judicial resolution of that issue. Hence, no later legislative enactment can effect a reversal of that determination.

Here, then, if we were to interpret the pertinent statute as having a retroactive effect, so that the supreme court's prior final determination of the jurisdictional issue must be disregarded, grave constitutional issues would be presented. Such an interpretation must be avoided, if possible.

Therefore, our review of the plain language of the statutory amendments and the legislative history surrounding the passage of House Bill 03–1288, and our determination that the definition at issue was not ambiguous before it was amended, convince us that House Bill 03–1288 was not a clarification of existing law; it constituted a change in the law. Further, to reach a contrary opinion would raise grave constitutional issues, at least as applied to these plaintiffs. Consequently, we conclude that the trial court erred in retroactively applying the statutory amendments to this case.

The judgment is reversed, and the case is remanded to the trial court for further pro-

ceedings consistent with the views set forth in this opinion.

Judge ROY and Judge NIETO* concur.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and