**RIDGEVIEW CLASSICAL SCHOOLS, a Colorado nonprofit corporation and charter school, Plaintiff–Appellant,**

v.

**POUDRE SCHOOL DISTRICT R–1, a Colorado school district, Defendant–Appellee.**

No. 07CA0292.

Colorado Court of Appeals, Div. V.

Nov. 26, 2008.

As Modified on Denial of Rehearing Jan. 22, 2009.

Certiorari Denied Aug. 31, 2009.

Arrington & Associates, P.C., Barry K. Arrington, Arvada, Colorado, for Plaintiff–Appellant.

Semple Miller Mooney & Farrington, P.C., Patrick B. Mooney, Denver, Colorado, for Defendant–Appellee.

Marjorie J. Long, Denver, Colorado, for Amicus Curiae.

Opinion by Judge ROY.

Ridgeview Classical Schools (the school) appeals the dismissal of its complaint seeking a declaratory judgment that a provision in its charter school contract with Poudre School District R–1 (the district) is null and void. We vacate the order and remand with directions to enter judgment in favor of the school.

The school offers classes from kindergarten through high school. For academic year 2006–2007, it was expected to enroll 688 students (658 full time), growing to 780 (roughly 60 students a class) over the next five years, with the expansion occurring in the high school.

The school was first approved by the district in 2001 for a term that expired on June 30, 2006. In the spring of 2006, the school submitted a renewal application to the district. Extensive negotiations ensued at the end of which two issues remained unresolved, a governance issue and a funding issue. The school appealed both issues to the State Board of Education (the board), which, on September 13, 2006, remanded the matters with directions that the parties negotiate further, that being the limit of its authority. *See Bd. of Educ. v. Booth,* 984 P.2d 639, 652–54 (Colo.1999). Further negotiations ensued, and a compromise was reached on both issues. However, prior to the execution of the contract, the district withdrew from the compromise on the funding issue, inserted its original proposal into the contract, and presented it to the school for signature. The school signed under protest.

The school then commenced these proceedings, alleging that paragraph 6.2.5 of the contract violated section 22–30.5–105(5), C.R.S.2008, and is, therefore, null and void. The district moved to dismiss the school's complaint for failure to state a claim upon which relief could be granted pursuant to C.R.C.P. 12(b)(5). The district argued that paragraph 6.2.5 of the contract is a statutorily valid "purchased service" agreement and that the school is not entitled to repudiate a portion of a contract it freely signed.

In an extensive order, the trial court concluded that paragraph 6.2.5 of the contract is

valid and granted the district's motion on the ground that the school's position was not supported by substantive law. This appeal followed.

## I. The Issue Presented

The issue presented is whether a provision in a charter school contract permitting the school district to retain a prorated portion of the "per pupil revenue" (PPR) for each student who transfers out of the charter school into another school in the district, or to pay the charter school in the same manner if a student transfers to the charter school from another school in the district, violates section 22–30.5–105(5), C.R.S.2008.

Section 22–30.5–105(5) provides:

Any term included in a charter contract that would require a charter school to waive or otherwise forego receipt of any amount of operational or capital construction funds provided to the charter school pursuant to the provisions of this article or pursuant to any other provision of law is hereby declared null and void as against public policy and is unenforceable.

## II. Standard of Review

In reviewing an order dismissing an action under C.R.C.P. 12(b)(5), we are in the same position as the trial court, and we apply the same standards; that is, we must accept all the allegations of fact as true and in the light most favorable to the plaintiff. *Pediatric Neurosurgery, P.C. v. Russell*, 44 P.3d 1063, 1067 (Colo.2002). Our review is, therefore, de novo.

We also review de novo a trial court's ruling on questions of law. *Premier Farm Credit, PCA v. W–Cattle, LLC*, 155 P.3d 504, 512 (Colo.App.2006). Further, the interpretation of a statute is such a question. *McIntire v. Trammell Crow, Inc.*, 172 P.3d 977, 979 (Colo.App.2007).

## III. The Record on Appeal

Initially, the district argues that the record on appeal is not sufficient for our review because it does not contain a copy of the contract and policies at issue.

Here, the school designated the record to include "all papers of any kind in the court's file." The certified record does not contain any documentary exhibits; however, the electronic record does contain all of the exhibits, which makes them available to us.

There does not appear to be any dispute as to the authenticity or accuracy of the exhibits in the electronic record as both parties have quoted extensively from them without objection in both the trial court and on appeal. Therefore, on our own motion and in the interest of judicial efficiency, we supplement the certified record with the electronic record including, without limitation, the contract and transfer policy.

## IV. The Contract

Paragraph 6.2.5 of the charter school contract states:

The cost of educating students who transfer, in accordance with paragraph 5.4 of this [contract], from [the school] to another school in [the district] and/or from another school in [the district] to [the school] after October 1 in any fiscal year this [contract] is in effect shall be accounted for as a purchased service for the education of such transfer students. The purchased service cost of educating each such transfer student shall be calculated by dividing the number of months remaining in the academic year after the month of the transfer by nine (9), and multiplying that quotient by the PPR funding for such student. In connection with [the school]'s signing of an addendum to [the contract] as provided in paragraph 7.14 below on or before each June 30 this [contract] is in effect, the parties shall consider and discuss whether the terms of this paragraph 6.2.5 should be amended and, if such amendment is agreed upon, it shall be reflected in the addendum to [the contract].

Paragraph 5.4 of the contract provides:

Transfers of students from [the school] to other schools in [the district], and from other schools in [the district] to [the school], shall be accomplished in accordance with [district] policies and regulations to the extent not waived or amended in writing by [the district]. Such transfers

shall be subject to the provisions concerning the purchased service cost of educating transfer students in paragraph 6.2.5 of this [contract].

Paragraph 7.10 of the contract incorporates "Exhibit E" as a list of district policies waived by the district. Exhibit E includes Policy "JFBA—Choice/Open Enrollment," which the district claims, and the school does not dispute, reserves to the district a right to prohibit student transfers between district schools after October 1 in any school year. *See* § 22–36–101(2)(b)(IV), C.R.S.2008 (reserving a district's right to prohibit transfers after October 1). It is this waiver that the district argues is consideration for paragraph 6.2.5 of the contract.

Finally, the contract contains a severability clause, denominated as an invalidity clause, which provides: "If any provision of this Renewal Contract is determined to be unenforceable or invalid for any reason, the remainder of the Renewal Contract shall remain in effect, unless otherwise terminated by one or both of the parties in accordance with the terms contained herein."

## V. The Charter School Act

The statutes governing school finance and charter schools are complex and have been frequently amended. A charter school is to be funded at ninety-five percent of an amount determined by multiplying the number of students enrolled in the charter school as of October 1 by the school district's PPR. § 22–30.5–112(2)(c)(II), C.R.S.2008. The five percent reduction is attributable to the school district's authority to charge the charter school for "central administration overhead costs" actually incurred up to but not exceeding that amount. § 22–30.5–112(2)(a)(III), C.R.S.2008. The method of computing those costs is detailed in the statute, and an accounting is required following the end of the fiscal year. § 22–30.5–112(2)(a.4)(I), (a.5).

In addition, the parties may negotiate and include in the contract a reimbursement to the school district for "direct costs" incurred by the district. Direct costs are those incurred in reviewing charter applications and charter contracts, and providing direct over-sight to charter schools. Direct costs do not include legal costs attributable to litigation or dispute resolution. If the parties fail to agree on an appropriate reimbursement, the school district may not withhold funds from the charter school for that purpose, but may present an accounting at the end of the fiscal year and be reimbursed. § 22–30.5–112(2)(b.5)(I), (II).

The PPR, or "district per pupil revenues," apparently synonymous terms, are defined in section 6.1.1 of the contract and section 22–30.5–112(2)(a.5)(II) as the district's total program funding (state and local) divided by the number of students enrolled in the district as of October 1 of each academic year. The "district's total program" or "district total program funding," also apparently synonymous terms, is defined by statute as follows:

> For every budget year, the provisions of this section shall be used to calculate for each district an amount *that represents the financial base of support for public education in that district.* Such amount shall be known as the *district's total program.* The district's total program shall be available to the district to fund the costs of providing public education, and, except as otherwise provided in section 22–54–105, the amounts and purposes for which such moneys are budgeted and expended shall be in the discretion of the district.

§ 22–54–104(1)(a), C.R.S.2008 (emphasis added).

> "District's total program" means the funding for a district, as determined pursuant to section 22–54–104 or section 22–54–104.3, whichever is applicable, *which represents the financial base of support for public education in that district.*

§ 22–54–103(6), C.R.S.2008 (emphasis added).

In addition, if a charter school provides federally required educational services, a proportionate share of the state and federal resources shall be directed to the charter school. § 22–30.5–112(3)(a)(II). Further, a proportionate share of moneys generated from state and federal categorical aid grants must be directed to such charter school if it

serves students eligible for the aid. § 22–30.5–112(3)(a)(III).

A charter school is entitled to receive and expend gifts, donations, and grants in accordance with the wishes of the donor, § 22–30.5–112(4), and may retain funds remaining in its accounts at the end of the fiscal year, regardless of the source, for use in subsequent fiscal years, which funds shall not revert to the school district or the state. § 22–30.5–112(4.5), C.R.S.2008.

Section 22–30.5–112(2)(b), C.R.S.2008, authorizes a charter school to contract with its school district for services and provides:

> The charter school, *at its discretion,* may contract with the school district for the direct purchase of district services in addition to those included in central administrative overhead costs, including but not limited to food services, custodial services, maintenance, curriculum, media services, and libraries. *The amount to be paid by a charter school in purchasing any district service pursuant to this paragraph (b) shall be determined by dividing the cost of providing the service for the entire school district, as specified in the school district's budget, by the number of students enrolled in the school district and multiplying said amount by the number of students enrolled in the charter school.*

(Emphasis added.)

The school district must provide the charter school with an accounting of the actual cost incurred for the contracted service after the close of the fiscal year. § 22–30.5–112(2)(a.4)(II).

In addition, a separate section grants a charter school the authority to contract with the school district and others for services. Section 22–30.5–104(7)(b) states:

> A charter school *may* negotiate and contract with a school district, the governing body of a state college or university, the state of Colorado, or any third party for the use of a school building and grounds, the operation and maintenance thereof, *and the provision of any service, activity, or undertaking that the charter school is required or chooses to perform in order to carry out the educational program described in its charter contract. Any services for which a charter school contracts with a school district shall be provided by the district at cost.* The charter school shall have standing to sue and be sued in its own name for the enforcement of any contract created pursuant to this paragraph (b).

(Emphasis added.)

The primary goal in statutory construction is to determine and give effect to the intent of the legislature. *Moffett v. Life Care Centers,* 187 P.3d 1140, 1143 (Colo.App. 2008) (citing *Colo. Office of Consumer Counsel v. Pub. Utils. Comm'n,* 42 P.3d 23, 27 (Colo.2002)). In doing so, we must consider the statutory language, giving words and phrases their plain and ordinary meanings. *Id.* (citing *Harding v. Heritage Health Prods. Co.,* 98 P.3d 945, 947 (Colo.App.2004)). We interpret the statute as a whole, "in a manner giving consistent, harmonious, and sensible effect to all its parts." *Id.* at 1143–44 (citing *Colo. Ins. Guar. Ass'n v. Menor,* 166 P.3d 205, 212 (Colo.App.2007)). Only when the statute is ambiguous do we consider prior law, legislative history, the consequences of a particular construction, and the fundamental purpose of the statute. *Id.* at 1144 (citing *Branch v. Colo. Dep't of Corr.,* 89 P.3d 496, 498 (Colo.App.2003)).

We recognize that we have, perhaps more than the reader or the issue requires, quoted extensively from, and described at length, the financial provisions of the Charter School Act, particularly those contained in section 22–30.5–112. That section is restrictive and highly detailed with respect to how a charter school is to be funded and the limits placed on the ability of the school district to reduce the funding below ninety-five percent of PPR.

Reading the Charter School Act as a whole, we conclude that the General Assembly has recognized that there is a natural tension between the charter school and the school district. It has further recognized that the school district is the conduit through which all of the public funding for the charter school—local, state, and federal—must pass, resulting in the school district having a vastly superior bargaining position.

Section 22–30.5–112, originally adopted in 1993, was amended in 1994, 1996, 1997, 1999, 2001, 2002, 2003, 2004, 2006, 2007, and 2008. While some of these amendments are technical in nature, the substantive amendments generally increased the protection for, and independence of, the charter school at the expense of the school district. In our view, the legislative history relating to section 22–30.5–105(5), the section which voids any term in a charter school contract requiring the school to waive or forego funding, is instructive in the construction of section 22–30.5–112. *See* Hearings on HB 02–1349 before the House Committee on Education, 63d General Assembly, 2d Session (Feb. 25, 2002). In discussing the addition of section 22–30.5–105(5) to the Charter School Act, legislators were specifically concerned that charter schools had to accept less funding than that dictated by the statute to get their applications approved. *Id.* The examples mentioned included the relinquishment of capital construction funds and the acceptance of funding at an online student rate instead of a residential rate.

In keeping with its intent, the General Assembly has permitted, but restricted, contracting between the school district and the charter school for services. The nature of the services for which a charter school may contract with its school district is specified in section 22–30.5–112(2)(b) and authorized for limited purposes by section 22–30.5–104(7)(b), and the method for determining the contract price is specifically defined, that is, the budgeted prorated per pupil cost to the school district for the service in section 22–30.5–112(2)(b) and "at cost" in section 22–30.5–104(7)(b).

### VI. Analysis and Holding

■ Unless paragraph 6.2.5 of the charter school contract qualifies as a "purchased services agreement," it is void under section 22–30.5–105. Reading sections 22–30.5–112(2)(b) and 22–30.5–104(7)(b), the statutes governing contracting for services collectively, and paraphrasing, it is apparent that in order for a contract for the purchase of services from the school district to be valid under section 22–30.5–105(5), it: (1) must be at the discretion of the school; (2) must be provided by the district at cost; and (3) must be for a direct budgeted service of the school district, or a service, activity, or undertaking that the charter school is required or chooses to perform in order to carry out the educational program described in its charter contract.

With respect to the first factor, in our view, it was not appropriate to dismiss the action under C.R.C.P. 12(b)(5) without developing the evidence of the negotiations and execution of the contract.

With respect to the second factor, while there is some budget information in the exhibits, the facts have not been sufficiently developed to enable us to review whether the service is provided at cost as required. That said, we note that the contract requires a pro rata reduction of the PPR funding to the school for a student transferring out, which necessarily would include a reduction of capital construction funds and other funds covering direct and indirect costs incurred in the operation of the charter school and the education of its students which are not enrollment sensitive. In our view, reciprocity notwithstanding, this reduction standing alone may violate section 22–30.5–105(5).

However, with respect to the third factor, we conclude that the "services" at issue, that is, either the waiver of a transfer policy or funding the transferred student's education in another school in the district, are not permitted or contemplated services within the meaning of either section 22–30.5–112(2)(b) or section 22–30.5–104(7)(b). Nor would further evidence impact the analysis. Therefore, we conclude that paragraph 6.2.5 of the contract violates section 22–30.5–105(5), is null and void as against public policy, and unenforceable.

As previously discussed, section 22–30.5–112(2)(b) authorizes a charter school to contract with the district "for the direct purchase of district services in addition to those included in central administrative overhead costs, including but not limited to food services, custodial services, maintenance, curriculum, media services, and libraries" on a per student prorated cost based on the district's system-wide budget for such services subject

to an accounting. The section limits the types of services that can be contracted for in two ways, by giving a nonexclusive list of them and by specifying the manner in which their cost is to be calculated.

Assuming, for purposes of discussion only, that the statute is ambiguous, the rule of *ejusdem generis* instructs that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." *Black's Law Dictionary* 556 (8th ed. 2004); *accord Davidson v. Sandstrom*, 83 P.3d 648, 656 (Colo.2004). Here, of course, the list of services is preceded by the expansive phrase, "including but not limited to." § 22–30.5–112(2)(b). In our view, in this context, the expansive phrase does not take this statute out of the rule. *See Van Pelt v. State Bd. for Cmty. Colls. & Occupational Educ.*, 195 Colo. 316, 320–21, 577 P.2d 765, 769 (1978).

However, even if the rule of *ejusdem generis* is not applicable here, the statutory costing formula further limits those services for which a charter school may contract with its school district under section 22–30.5–112(2)(b) to those separately budgeted on a district-wide basis and, therefore, actually provided by the district at, or through, its other schools.

Similarly, section 22–30.5–104(7)(b), which expands the entities with which a charter school may contract for services, it limits the nature of the services to "any service, activity, or undertaking that the charter school is required or chooses to perform in order to carry out the educational program described in its charter contract." And, in addition, section 22–30.5–104(7)(b) requires that any such contract with a school district must be "at cost," without specifying how cost is to be determined.

Here, the charter contract does not specify or describe a unique educational program; rather, it appears to require that the school teach the district curriculum and program. The school district's waiver of its transfer policy or the payment of the cost by the charter school of educating a transfer student in another district school is clearly not a service, activity, or undertaking the school performs in order to carry out its educational program.

Therefore, for the reasons stated, we conclude that because paragraph 6.2.5 of the contract cannot qualify as a contract for services under section 22–30.5–104(7)(b) or 22–30.5–112(2)(b), it is invalid under section 22–30.5–105(5), and is, therefore, null and void, and against public policy as a matter of law.

## VII. The District's Arguments for Affirmance

In support of the trial court's order dismissing the complaint, the district raises arguments that we consider briefly below.

### A. Funding Enrollment Date

■ The district argues that even if paragraph 6.2.5 of the contract is not a valid service contract, it nonetheless does not require the school to waive or forego funding to which it is entitled by law. We disagree.

The gist of the district's argument is that it may determine the school's enrollment for the purposes of funding on a monthly basis as there is no funding enrollment date specified in the Charter Schools Act. However, paragraph 6.1.3 of the contract specifies that the school's PPR is established based on its enrollment on October 1. The contract notwithstanding, the determination of PPR is statutory, and the district is required to base the funding for the school on its PPR, § 22–30.5–112(2)(a)(III), which is determinable on October 1 of each academic year. Further, the district's position ignores the school's need for stability in funding because a significant portion of its annual expenses are fixed and do not vary with enrollment.

### B. The District's Motivation

The district also argues that paragraph 6.2.5 of the contract was motivated by the school's practice of transferring students back to the district after October 1. The motivation of the district in insisting on paragraph 6.2.5 of the contract is not germane to its validity under section 22–30.5–105(5), and, in any event, is not before us at this juncture of the proceedings.

### C. Locally–Raised Funds

Finally, the district argues that nullifying paragraph 6.2.5 of the contract would require it to relinquish its right to allocate locally-raised educational funds. *See* Colo. Const. art. IX, § 15.

Article IX, § 15 of our Constitution states: The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. Said directors shall have control of instruction in the public schools of their respective districts.

Control over instruction requires "substantial discretion regarding the character of instruction that students will receive at the district's expense." *Booth*, 984 P.2d at 648. However, control over instruction is inextricably linked to control over locally-raised funds. "The representative structure created in article IX, section 15 functions by entrusting locally-elected district board members with the discretion to disburse locally-raised tax revenues on education." *Owens v. Colo. Congress of Parents, Teachers & Students*, 92 P.3d 933, 941 (Colo.2004).

In *Owens*, a group of parents challenged a school voucher pilot program that would have forced school districts with underperforming schools to pay private schools for the education of low-income students who chose to participate in the program. *Id.* at 936. Our supreme court held that the program violated our state constitution because it forced public schools to spend locally-raised funds on education programs over which they had no control. *Id.* at 943–44.

The circumstances of this case are distinguishable from those in *Owens*. Here, the school is public, not private. Further, the district retains significant control over the educational program of the school. The charter contract is required by statute to include detailed descriptions of the school's goals, objectives, performance standards, education program, economics, governance and operation, and employment policies. § 22-30.5-106, C.R.S.2008. The contract itself addresses these areas and more, including curriculum content, student health screening, and extracurricular activities, among others. Thus, the district exerts extensive local control over the school's educational program through the contract itself.

The funding statute provisions discussed herein, and our disposition of this case, require only that the district fund a charter school at the PPR that is available for the funding of the other schools in the district. In our view, the funding requirements effectuate the balance between the state's constitutional authority to set educational policy and a school board's constitutional authority to control education at the local level as envisioned by our state constitution. *See* Colo. Const. art. IX, § 1 (general supervision vested in state board of education); Colo. Const. art. IX, § 15 (local control vested in locally-elected school boards); *Booth*, 984 P.2d at 647–49.

Thus, we conclude that the statutes that regulate contracts for services between a charter school and its school district neither abrogate, nor infringe upon, the school district's right to control locally-raised funds. *See Booth*, 984 P.2d at 645–46.

The order dismissing the complaint is vacated, and the case is remanded with directions to reinstate the complaint and enter judgment for the school that paragraph 6.2.5 of the contract is null and void, and against public policy; and for further proceedings not inconsistent with the views and conclusions expressed in this opinion. *See City of Leadville v. Bishop*, 14 Colo.App. 517, 526, 61 P. 58, 61 (1900).

Judge GRAHAM and Judge J. JONES concur.