**DOLORES HUERTA PREPARATORY HIGH, Laura Maestes, Denise Gallegos, and Maritza Martinez, Plaintiffs–Appellants,**

v.

**COLORADO STATE BOARD OF EDUCATION and Pueblo School District No. 60, a Colorado municipal corporation, Defendants–Appellees.**

No. 08CA0664.

Colorado Court of Appeals, Div. IV.

April 2, 2009.

Atencio Law Firm, Dolores S. Atencio, Denver, Colorado; Kutz & Bethke, LLC, William P. Bethke, Lakewood, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Antony B. Dyl, Senior Assistant Attorney General, Lorna A. Candler, Assistant Attorney General, Denver, Colorado, for Defendant–Appellee Colorado State Board of Education.

Petersen & Fonda, P.C., Thomas T. Farley, Patrick Garcia, James R. Gerler, Bradley Bufkin, Marty E. Jensen, Pueblo, Colorado, for Defendant–Appellee Pueblo School District No. 60.

Opinion by Judge WEBB.

In this dispute over the terms of a charter school contract, plaintiffs, Dolores Huerta Preparatory High (DHPH), a public charter school, and Laura Maestes, Denise Gallegos, and Maritza Martinez (Parents), parents of three DHPH students, appeal the judgment dismissing their complaint against defendants, the Colorado State Board of Education (Board) and Pueblo School District No. 60, a Colorado municipal corporation (District). Because DHPH lacks standing and no violations of Parents' constitutional rights occurred, we affirm.

## I. Introduction

In 1993, the General Assembly authorized charter schools in Colorado. §§ 22–30.5–101 to –115, C.R.S.2008 (Part 1 of the Charter Schools Act). The Act defines a charter school as a public school created when a school district "approves its charter application and enters into a charter contract" with the school. § 22–30.5–104(2)(b), C.R.S.2008.

A charter school must be funded at a minimum of ninety-five percent of the amount determined by multiplying the number of enrolled charter school students by the school district's per pupil revenue (PPR). § 22–30.5–112(2)(c)(II), C.R.S.2008. The charter school may contract with the district for operation and maintenance services at the district's cost. § 22–30.5–104(7)(b), C.R.S. 2008; *see generally Ridgeview Classical Schools v. Poudre School District R–1*, 214 P.3d 476 (Colo.App. 2008).

The District and DHPH entered into a charter school contract that contemplated funding for a long-term DHPH facility based on sharing proceeds of future mill levies or bond issues, but did not provide any specific facility funding. Instead, the District made available to DHPH modular structures that lacked a library, a science lab, and even running water, although staff and students had access to restrooms in an adjoining elementary school. DHPH obtained a loan to construct its own building and allocated some of its PPR to finance this debt.

To obtain specific long-term facility funding, DHPH initiated non-binding third-party arbitration under section 22–30.5–107.5, C.R.S.2008. The arbitrator agreed with DHPH that section 22–30.5–105(2)(c)(II), C.R.S.2008, required a charter school contract to include such funding and ordered the District to provide DHPH with $900,000 in such funding. This amount had been included in DHPH's charter application, but the District rejected it as a contract term.

The District appealed to the Board, which vacated the award. It concluded that "the contract complied with the statute" because:

> [T]he "manner" and amount of any such support is left to be negotiated and agreed upon between the District and the charter applicant. Here, the contract did include terms regarding support of [DHPH's] long term facility need....

DHPH and the Parents brought this action asserting claims for declaratory relief, certiorari under C.R.C.P. 106(a)(4), and mandamus under C.R.C.P. 106(a)(2) based on alleged violation of section 22–30.5–105(2)(c)(II), Colorado Constitution Article II, section 25, and Colorado Constitution Article IX, section 2. The court granted defendants' motion to dismiss the complaint.

We review a trial court's ruling on a motion to dismiss de novo. We accept as true all averments of material fact contained in the complaint and treat the allegations of the complaint in the light most favorable to the claimant. *Kaercher v. Sater*, 155 P.3d 437, 439 (Colo.App.2006).

## II. DHPH Claims

DHPH challenges the trial court's ruling that under the political subdivision doctrine it lacked standing to sue the District or the Board and that section 22–3.5–107.5 precludes judicial review of Board action concerning the governing policy provisions of charter school contracts. We agree with the trial court.

### A. As a Political Subdivision, DHPH Lacked Standing To Sue the District and the Board

 Standing is a limitation on a court's subject matter jurisdiction that we review de novo. *People in Interest of J.C.S.*, 169 P.3d 240, 243 (Colo.App.2007).

 Under the political subdivision doctrine, "disputes between a subordinate and a superior state agency are properly to be resolved within the executive branch without resort to judicial review." *Maurer v. Young Life*, 779 P.2d 1317, 1323 (Colo.1989). Thus, an agency lacks standing when (1) the agency seeking judicial review is subordinate to the agency whose decision is sought to be reviewed, and (2) no statutory or constitutional provision confers a right on the agency to seek such judicial review. *Martin v. Dist. Court*, 191 Colo. 107, 109, 550 P.2d 864, 866 (1976); *see also City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 438 (Colo.2000).

This rule:

> [A]pplies to school districts as well as to counties in that "the several officers charged with the supervision of the schools, from the state board of education down to the directors of the school district, are merely the instruments of the state government chosen for the purpose of effectuating its policy in relation to schools."

*Denver Ass'n for Retarded Children, Inc. v. School Dist. No. 1*, 188 Colo. 310, 316, 535 P.2d 200, 204 (1975) (political subdivision of the state lacked standing to challenge constitutionality of state statute).

In *Academy of Charter Schools v. Adams County Sch. Dist. No. 12*, 994 P.2d 442, 444 (Colo.App.1999), *aff'd in part and rev'd in part on other grounds*, 32 P.3d 456 (Colo.

2001), the division held that "[w]ithout a plain and unmistakable expression of legislative intent to the contrary, a subordinate agency [the charter school] may not litigate against a superior agency [its district]." The supreme court, 32 P.3d at 464, reaffirmed the political subdivision rule ("the judiciary will not expand the rights of a subordinate agency to sue its superior governmental body"), but then found the requisite legislative authority for suit by a charter school to enforce an operation and maintenance contract in section 22–30.5–104(7)(b).

This analysis necessarily implies that a charter school is otherwise subject to the political subdivision doctrine. DHPH so conceded at oral argument, and it does not assert that its claims fall within section 22–30.5–104(7)(b).

Nevertheless, DHPH argues that it has standing based on other statutes such as the Declaratory Judgment Act, section 13–51–106, C.R.S.2008, the Administrative Procedure Act, section 24–4–106, C.R.S.2008, and C.R.C.P. 106.

Similar arguments have been rejected. *See Romer v. Fountain Sanitation Dist.*, 898 P.2d 37, 41 (Colo.1995) ("In creating a new remedy [in the Declaratory Judgment Act] the General Assembly did not by implication grant political subdivisions of the state the right to sue the state."); *State Dep't of Personnel v. Colorado State Personnel Bd.*, 722 P.2d 1012, 1019 (Colo.1986) ("C.R.C.P. 106(a)(4) says nothing about conferring standing upon persons or parties who would not otherwise have it."); *Romer v. Board of County Comm'rs*, 956 P.2d 566, 577 (Colo. 1998) ("Section 24–4–106(4) of the APA ... does not create a legally protected right so as to confer ... standing to seek judicial review. Rather, section 24–4–106(4) simply addresses the procedures of review available once it is properly established that the dispute is justiciable pursuant to some other statutory grant.").

DHPH's further argument that it has standing as a nonprofit corporation, *see* § 7–123–102(1)(a) ("every nonprofit corporation has ... the power ... [t]o sue and be sued"), is precluded by section 22–30.5–104(4), C.R.S. 2008, (while a charter school "may" organize as a nonprofit corporation, this "shall not affect its status as a public school for any purposes under Colorado law"). *See also Academy*, 994 P.2d at 445 (fact that charter school was a nonprofit association did not alter its status as subordinate part of the school district without authority to sue).

Accordingly, DHPH lacks standing under the political subdivision doctrine.

### B. Section 22–30.5–107.5 Further Precludes Judicial Review of the Board's Decision

Under section 22–30.5–107.5(1), the procedure invoked by DHPH, "any disputes that may arise between a charter school and its chartering school district concerning governing policy provisions of the school's charter contract shall be resolved pursuant to this section." The District's appeal invoked section 22–30.5–107.5(6) ("Any decision by the state board pursuant to this section shall be final and not subject to appeal.").

In *Academy of Charter Schs. v. Adams County Sch. Dist. No. 12*, 32 P.3d at 468–69, the supreme court explained that while section 22–30.5–104(7)(b):

> [E]xpressly authorizes charter schools to sue their school districts for enforcement of any facilities operation and maintenance contract ... [t]he legislature has made it clear that charter schools do not have standing to sue their superior school districts for disputes arising from implementation of the governing policy provisions in their charter contracts as described in sections 22–30.5–105 and –106.

The governing policy provisions of sections 22–30.5–105 and –106 "broadly encompass almost all aspects of the governance and policies of a charter school, including the curriculum, goals, objectives, pupil performance standards, employment policies, and budget." *Id.* at 462.

▮ Under section 22–30.5–105(2)(c)(II), a charter school contract shall specify "[t]he manner in which the school district ... will support any long-term facility needs of the charter school." But the statute does not set a minimum for such support, qualitatively or

quantitatively. Hence, DHPH's dissatisfaction with the provision of its charter contract that addresses long-term facility support through sharing proceeds of future mill levies or bond issues "aris[es] out of implementation of the statutorily required portions of the charter contract" and is "reserved for resolution by the State Board." *Academy*, 32 P.3d at 459. Consequently, "[b]ecause the General Assembly has not granted standing to charter schools for these types of governing policy claims, courts lack jurisdiction to hear them." *Id.* at 469.

DHPH's attempt to distinguish *Academy* as limited to enforcement of a charter contract provision, in contrast to the alleged deficiency in the facility support provision of its contract, ignores the broad wording of section 22–30.5–107.5(1), which applies to any disputes "concerning" the governing policy provisions of a charter contract. *Cf. Ingold v. AIMCO/Bluffs, L.L.C. Apartments*, 159 P.3d 116, 122 (Colo.2007) (broadly interpreting term "concerning" in an arbitration clause).

DHPH's reliance on *Ridgeview*, 214 P.3d at 476, is misplaced. The charter school in that case did not challenge a Board decision. *Ridgeview* did not mention section 22–30.5–107.5(6) or otherwise address the charter school's standing.

DHPH's argument that section 22–30.5–107.5(6) does not bar certiorari or mandamus relief under C.R.C.P. 106, is at odds with the following statement in *Academy:*

> [T]he State Board has complete statutory authority to settle any disputes arising from implementation of those governing policy provisions of that contract. In essence, the governing policy provisions of the charter contract are not subject to judicial review.

32 P.3d at 462. The *Academy* court also said that "the State Board is the sole appellate authority for disputes arising from governing policy agreements." *Id.* at 463.

Accordingly, DHPH cannot obtain judicial review of the Board's decision.

In sum, we conclude that the trial court did not err by dismissing DHPH's claims because under the political subdivision doctrine it lacked standing to sue the District or the Board, and because section 22–30.5–107.5 does not permit judicial review of a Board decision concerning the governing policy provisions of charter school contracts. Given this conclusion, we address the constitutional issues only in terms of the Parents' appeal.

### III. The Parents' Claims

The Parents contend the trial court erred by dismissing their claims that lack of specific long-term facility funding violated their rights under the Colorado Constitution. Again, we agree with the trial court.

### A. The Thorough and Uniform Clause Does Not Protect Parents

The complaint alleges that the District and the Board "have through their joint action and inactions violated the requirement that Colorado's system of public schools be 'thorough and uniform,' as required by Article IX, section 2 of the Colorado Constitution."

■ Under this section "[t]he general assembly shall ... provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state...." It requires the General Assembly to "provide to each school age child the opportunity to receive a free education, and to establish guidelines for a thorough and uniform system of public schools." *Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1019 (Colo.1982). It does not require either "equal expenditures within the districts" or "that educational expenditures per pupil in every school district be identical." *Id.* at 1025.

Here, the Parents argue that by "providing inadequate facilities for DHPH [and] doing so inequitably in relation to the support given other schools of the District ... the Board and the District have ... violated the requirement that Colorado's system of public schools be 'thorough and uniform'." But they cite no case, and we have found none, interpreting "thorough and uniform" to require that a district equitably allocate expenditures among all schools within the district. Their interpretation would be contrary to the rejection of "equal expenditures" in *Lujan.*

Such an interpretation would also conflict with the grant of control over locally-raised funds to school districts under Article IX, section 15 of the Colorado Constitution (local school boards "shall have control of instruction in the public schools of their respective districts"). "[E]ach school district must be given the control necessary to implement [the mandate of Article IX, section 2] at the local level." *Lujan,* 649 P.2d at 1025; *see Bd. of Educ. of Sch. Dist. No. 1 v. Booth,* 984 P.2d 639, 653 (Colo.1999) ("We will adopt an interpretation that causes ... constitutional conflicts only if there is no plausible alternative as to the General Assembly's intent.").

■■■ Article IX, section 15 implements the principle that "[a]llowing a district to raise and disburse its own funds enables the district to determine its own educational policy, free from restrictions imposed by the state or any other entity." *Owens v. Colorado Congress of Parents, Teachers and Students,* 92 P.3d 933, 941 (Colo.2004). Indeed, "control over instruction is inextricably linked to control over locally-raised funds." *Id.* Thus, "by entrusting locally-elected district board members with the discretion to disburse locally-raised tax revenues on education ... district residents are able to tailor educational policy to meet the needs of the individual districts, without state interference." *Id.*

In *Ridgeview,* 214 P.3d at 484, the division cited *Booth* in concluding that "the statutes that regulate contracts for services between a charter school and its school district neither abrogate, nor infringe upon, the school district's right to control locally-raised funds." But contrary to the Parents' assertion, *Ridgeview* does not require that "thorough and uniform" in Article IX, section 2 be interpreted as requiring the District to provide parity in long-term facility funding for each of its schools, at the expense of local control over school funding.

*Ridgeview's* holding rests on section 22–30.5–105(5), which voids "[a]ny term included in a charter contract that would require a charter school to waive or otherwise forego receipt of any amount of operational or capital construction funds provided to the charter school pursuant to the provisions of this arti-cle." That section is not at issue in this case. *Ridgeview* involved mandatory funding based on the PPR formula set by section 22–30.5–112(2)(a)(III), which also has not been raised here.

Further, *Booth,* 984 P.2d at 643, held constitutional the "second appeal" provision of the Charter Schools Act, section 22–30.5–108(3)(d), C.R.S.2008, which authorized the State Board to order a local school district to approve a charter school application. The court concluded that because "[a]n application need not identify a site for the school ... [nor] establish the district's funding obligation," ordering an application's approval "was intended to be an interim step toward creation" of a contract between the charter school and its district. *Id.* at 653–54. Such an order does "not requir[e] the local board to open a school." *Id.* at 654. Rather, it "creates a good faith commitment on the part of the local board to work with the charter applicants toward ... producing a satisfactory final contract...." *Id.* at 655.

In so concluding, the court recognized that a final contract would require the district to provide both minimum funding for the charter school based on the PPR formula discussed in section 22–30.5–112(2)(a)(III) and space in any available facility without charge for rent based on section 22–30.5–104(7)(c). However, as the division recognized in *Boulder Valley School Dist. RE-2 v. Colo. State Bd. of Educ.,* 217 P.3d 918, 926, 2009 WL 399991 (Colo.App. No. 07CA1599, Feb. 19, 2009), the court discerned no impermissible infringement on local control because the exact terms of these requirements must be resolved by the parties in negotiating the final contract. *Booth,* 984 P.2d at 654.

■■■ Similarly here, because section 22–30.5–105(2)(c)(II) requires only that charter school contracts address the "manner" of support, a charter school and its district must negotiate what that support will be. In contrast, requiring comparable facility support among the various schools in the District, as Parents assert, would take away the power to negotiate recognized in *Booth.* Thus, such a requirement would be a greater infringement on a district's local funding con-

trol than the second-appeal provision upheld in *Booth.*

Moreover, in *Booth* the supreme court recognized that "the reviewing court must strike a balance between local control of instruction and the State Board's general supervision." 984 P.2d at 649. It declined to "attempt a definitive constitutional demarcation," in favor of reviewing "each case on its facts." *Id.* at 649–50. Turning to the tension between the local control clause and the Board's power under the second-appeal provision, the court explained:

> In a case such as this, where the General Assembly has allocated authority between the State Board and local boards in order to further a legitimate educational purpose, we will give deference to the balance that it sought to maintain between the two entities. That is, we will presume the allocation is valid unless it clearly impedes the capacity of either the State Board or a local board to exercise its independent constitutional authority.

*Id.* at 650.

 Here, as explained in the Board's decision, the General Assembly has not allocated authority for the Board to order that charter schools receive any particular level or type of long-term facility support under section 22–30.5–105(2)(c)(II), at the expense of local control. Hence, the balancing approach of *Booth* based on deference to legislative action does not support interpreting the "thorough and uniform" clause as requiring funding for long-term charter school facilities in parity with those of noncharter schools.

## B. The Choice to Attend a Charter School Is Not a Constitutional Right

The complaint also alleges that the District and the Board "have unconstitutionally required such parents to sacrifice their right to adequate and equitable school facilities and funding in order to exercise their right to select DHPH as a means of directing their child's education."

According to the reply brief, "we have made no claim of any description under federal law." Instead, the Parents cite *People*

*ex rel. Vollmar v. Stanley,* 81 Colo. 276, 294, 255 P. 610, 618 (1927), where the supreme court upheld a school board rule requiring Bible reading in public schools, provided "that children whose parents or guardians so desire may absent themselves for such reading."

Although *Vollmar* was later overruled on Establishment Clause grounds, *Conrad v. City & County of Denver,* 656 P.2d 662, 670 (Colo.1982), the Parents rely on the statement that because "[t]he parent has a constitutional right to have his children educated in the public schools of the state[,] Colo. Const. Article IX, section 2 ... [and] to direct, within limits, his children's studies," the school board cannot "make the surrender of the second [right] a condition of the enjoyment of the first." *Vollmar,* 81 Colo. at 282, 255 P. at 614. The *Vollmar* majority explained that parents "can refuse to have [their children] taught what they think harmful, barring what must be taught, i.e., the essentials of good citizenship." *Id.* at 281, 255 P. at 613.

 But here, no such forced choice exists because the Parents' complaint did not allege, nor do they argue on appeal, that either their children can learn the "essentials of good citizenship" only at DHPH or those children's attendance at noncharter schools in the District will expose them to anything which should not be taught because it is "immoral or inimical to the public welfare." *Id.* Therefore, even if inadequacy of the original facilities at DHPH might in effect have compelled the children to attend a noncharter school, thus creating a potential controversy subject to declaratory relief, they have not forfeited the protection of Article IX, section 2 that the General Assembly "provide to each school age child the opportunity to receive a free education...." *Lujan,* 649 P.2d at 1018–19.

 Moreover, the Parents have cited no authority, and we have found none, treating attendance at a charter school as a constitutional right. At most, this right is statutory. *See* § 22–30.5–102(2)(f) (purpose of Charter Schools Act is to "provide parents and pupils with expanded choices in the types of education opportunities that are available within the public school system").

But the government has no constitutional obligation to fund the exercise of a constitutional right. *See, e.g., Rust v. Sullivan*, 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.") (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)); *Harris v. McRae*, 448 U.S. 297, 316, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ("[I]t simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices."). Hence, the government need not fund the exercise of a mere statutory right.

### C. The Equal Protection Claim Is Not Properly Before Us

The Parents' complaint further alleges that the Board and the District "violated principles of equal treatment under the law as embodied in Article II, section 25 of the Colorado Constitution, to the detriment of each plaintiff."

We decline to address this claim because the opening brief neither makes any argument to support it nor even cites Article II, section 25. *See, e.g., Western Innovations, Inc. v. Sonitrol Corp.*, 187 P.3d 1155, 1160 (Colo.App.2008) (declining to address contention not argued in opening brief); *Bloom v. National Collegiate Athletic Ass'n*, 93 P.3d 621, 623 (Colo.App.2004) (mere footnote reference "insufficient to warrant review of that claim").

The reply brief mentions "rational relation" scrutiny only in arguing for justiciability. And in any event, we do not consider arguments made for the first time in a reply brief. *See, e.g., Barrett v. Inv. Mgmt. Consultants, Ltd.*, 190 P.3d 800, 805 (Colo.App. 2008).

The judgment is affirmed.

Judge FURMAN and Judge RICHMAN concur.